UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
FRANKFORT

CIVIL ACTION NO. 3:05-24

DIRECTV, INC., et al.,                                              PLAINTIFFS,

v.                                      **OPINION AND ORDER**

MARK TREESH,
in his official capacity
as Commissioner of the
Department of Revenue,                                              DEFENDANT.

**** **** **** ****

This matter is before the Court on the Motion to Dismiss (Rec. No. 10) filed by the
Defendant, Mark Treesh (the "Commissioner"), who has been sued in his official capacity as
Commissioner of the Kentucky Department of Revenue. The Plaintiffs, DIRECTV, Inc. and
Echostar Satellite, LLC (the "Satellite Companies"), argue that recently enacted Kentucky corporate
tax provisions unconstitutionally discriminate against interstate commerce by benefitting cable
television operators (the "Cable Companies") and burdening the Satellite Companies. For the
following reasons, the Court will GRANT the Motion to Dismiss.

I.      FACTS.

A.      **The Satellite Companies.**

The Plaintiff, DIRECTV is organized and headquartered in California. (Rec. No. 1,
Complaint ¶ 6). The Plaintiff, EchoStar Satellite, LLC, is organized and headquartered in Colorado.
(Rec. No. 1, Complaint ¶ 7). Neither plaintiff has any offices located in Kentucky. (Rec. No. 1,
Complaint ¶ 17).

The Satellite Companies provide multi-channel video programming to subscribers by means

of satellites stationed above the Earth.  (Rec. No. 1, Complaint ¶ 13). The federal government grants the Satellite Companies the right to transmit in certain electromagnetic frequencies from satellites located at certain orbital positions. (Rec. No. 1, Complaint ¶ 14). Subscribers in Kentucky then receive the signal from these satellites by means of a small satellite dish mounted on or near their house.  (Rec. No. 1, Complaint ¶ 15).

In their Complaint, the Satellite Companies state that, because they do not use any public rights-of-way, they are not required to obtain franchise rights from local governments to operate in Kentucky. (Rec. No. 1, Complaint ¶ 16).  In their brief as *amicus curiae*, the Kentucky Cable Telecommunications Association (the "KCTA") asserts that the Satellite Companies transmit the programming of local broadcast stations and that, in order to do this, they must have "local receive facilities" on the ground in Kentucky to receive the signals of local broadcast stations.  (Rec. No. 28 Brief for KCTA as *Amicus Curiae* at 18 n.7).

The Satellite Companies state that DIRECTV has two sales employees in Kentucky and EchoStar has six sales employees in Kentucky.  (Rec. No. 1, Complaint ¶ 17). The KCTA asserts that, in addition to regular employees, the Satellite Companies employ a "legion" of local contractors in Kentucky to sell their services and receive dishes.  (Rec. No. 28 Brief for KCTA as *Amicus Curiae* at 18 n.7).

### B.     The Cable Companies.

The Cable Companies provide multi-channel video programming by means of cable networks located in Kentucky. (Rec. No. 1, Complaint ¶ 2).  The Cable Companies receive programming at cable headends located in Kentucky and then transmit the programming to Kentucky subscribers by way of cables laid in trenches in or along roads or hung on utility poles in the state and connected

2

to the subscribers' television sets and set top boxes.  (Rec. No. 1, Complaint ¶ 18).

In their Complaint, the Satellite Companies assert that the Cable Companies must obtain local government permission to use roads and other rights-of-way in order to lay or string cable connecting their local distribution facilities to the subscribers' homes. (Rec. No. 1, Complaint ¶ 19). According to the Satellite Companies, local governments grant this permission by franchise agreements and permits granted to the Cable Companies.  (Rec. No. 1, Complaint ¶ 19).  The Satellite Companies assert that, in return for permission to use public rights-of-way, the Cable Companies pay a franchise fee to the applicable local government that is typically five percent of gross revenue within the franchise area. (Rec. No. 1, Complaint ¶ 20).

The KCTA asserts that the Cable Companies transmit national satellite-delivered programming, broadcast television signals and regional cable television network programming.  In doing so, they rely on satellite transmissions, microwave relay stations and interstate fiber optic communications lines that beam their transmissions across state boundaries.  (Rec. No. 28 Brief for KCTA as *Amicus Curiae* at 15-17).  *See also*, *Int'l Cablevision, Inc. v. Sykes*, 75 F.3d 123, 126 (2nd Cir. 1996) ("Cablevision sells cable television programming which it delivers to its customers from the system headend via coaxial ground cable. The headend has parabolic or other appropriately shaped antennas for receiving satellite-delivered program signals, high-gain directional antennas for receiving distant TV broadcast signals, directional antennas for receiving local signals, machines for playback of taped programming and commercial insertion, and studios for local origination and community access programming.") (quotations and citation omitted).

The KCTA also asserts that the three largest cable companies in Kentucky are headquartered in states other than Kentucky.  According to the KCTA, these companies are Insight

3

Communications which is headquartered in New York, Adelphia Communications which is headquartered in Greenwood Village, Colorado and Charter Communications which is headquartered in St. Louis. (Rec. No. 28 Brief for KCTA as *Amicus Curiae* at 16 n.6).

The Satellite Companies assert that the Cable Companies employ numerous Kentucky residents and have numerous offices and facilities in Kentucky. (Rec. No. 1, Complaint ¶ 21). The Satellite Companies assert that they are competitors of the Cable Companies in the market for multi-channel video programming distribution. (Rec. No. 1, Complaint ¶ 22). According to the Satellite Companies, both the Cable Companies and the Satellite Companies sell various packages of television channels including local television stations and cable programming. (Rec. No. 1, Complaint ¶ 22).

**C**.     **Situation Prior to the 2005 Amendments.**

The legislation that is the subject of the Satellite Companies' Complaint was enacted by the Kentucky General Assembly in March, 2005. 2005 KY H.B. 272, Kentucky H.B. No. 272, 2005 Regular Session (Ky. 2005)(the "2005 Amendments")(relevant provision codified at various sections of Chapter 136 of the Kentucky Revised Statutes).

Prior to the 2005 Amendments, neither the Cable Companies nor the Satellite Companies were required to pay Kentucky state sales tax. In addition, pursuant to § 602(a) of the federal Telecommunications Act of 1996, the Satellite Companies were and are exempt from local taxes and fees. Pub. L. No. 104-104, Title VI, § 602(a), 110 Stat. 144(a)(1996) (reprinted at 47 U.S.C. § 152, historical and statutory notes). Nevertheless, the Telecommunications Act explicitly permits states to impose a tax on the Satellite Companies and to distribute the proceeds from the tax to local governments. Pub. L. No. 104-104, Title VI, § 602(c), 110 Stat. 144(a)(1996) (reprinted at 47

4

U.S.C. § 152, historical and statutory notes).  Meanwhile, as discussed above, the Cable Companies paid franchise fees to local governments in return for franchise agreements permitting them to use road and other rights-of-way to lay or string cable.  (Rec. No. 1, Complaint ¶ 19).

**D.    The 2005 Amendments.**

With the 2005 Amendments, the legislature sought to provide "a fair, efficient and uniform method for taxing communications services sold in this Commonwealth" and to simplify "an existing system that includes a myriad of levies, fees and rates imposed at all levels of government." 2005 KY H.B. 272 § 88(1), (3) (codified at KRS § 136.600(1), (3)).  The relevant provisions of the 2005 Amendments became effective on January 1, 2006.  2005 KY H.B. 272 § 168.

**1)    Section 90 – New Excise Tax on Purchasers.**

Section 90 of the 2005 Amendments imposes an excise tax on the retail purchase of multichannel video programming service provided to a person whose place of primary use is in the state. 2005 KY H.B. 272 § 90(1) (codified at KRS § 136.604(1)).  The amendments define "multichannel video programming service" as "cable service and satellite broadcast and wireless cable service."  2005 KY H.B. 272 § 89(8)(codified at KRS § 136.602(8)). The excise tax is three percent of the sales price charged for the service. 2005 KY H.B. 272 § 90(2)(codified at KRS § 136.604(2)). The amendments require the provider to collect the excise tax from the purchaser. 2005 KY H.B. 272 § 91(1)(codified at KRS § 136.606(1)).

**2)    Section 96 – New Gross Revenue Tax on Providers.**

Section 96 of the 2005 Amendments imposes a 2.4 percent tax on a multichannel video programming service provider's gross revenues. 2005 KY H.B. 272 § 96(1),(2)(a)(codified at KRS § 136.616(1), (2)(a)).  Unlike the excise tax, the provider is prohibited from collecting the 2.4

5

percent gross revenue tax directly from the purchaser or to separately state the tax on the bill to the purchaser.  2005 KY H.B. 272 § 96(3)(codified at KRS § 136.616(3)).

    **3)**       **Section 112 – Creation of Designated Fund.**

Section 112 of the 2005 Amendments establishes a gross revenues and excise tax fund. 2005 KY H.B. 272 § 112 (1)(codified at KRS § 136.648(1)).  All revenue from the gross revenues and excise tax imposed under Sections 90 and 96 are to be deposited into the fund.  2005 KY H.B. 272 § 112(3)(codified at KRS § 136.648(3)).   The money in the new fund is to be allocated among the state, political subdivisions, school districts and special districts. 2005 KY H.B. 272 §112(3)(codified at KRS § 136.648(3)).

    **4)**       **Section 113 – Portion of Designated Fund Distributed to Local Governments.**

Under section 113 of the 2005 Amendments, each local government must certify to the Revenue Cabinet the local franchise fees it collected from communication services and multichannel video programming service providers and other fees collected to fund public educational and government access programming in Fiscal Year 2005. 2005 KY H.B. 272 § 113(1)(codified at KRS § 136.650(1)). This certified amount is then used to determine the monthly portion of the gross revenues and excise tax fund that will be distributed to each local government.  2005 KY H.B. 272 § 113(2)(codified at KRS § 136.650(2)).

Specifically, the amendments provide that each local government will be  assigned a percentage, called the "local historical percentage," which is based on the amount of the local government's certified collections as a ratio of the total certified amount of collections of all parties participating in the fund. 2005 KY H.B. 272 § 113(2)(a)(codified at KRS § 136.650(2)(a)). Each month, each local government is to be distributed an amount equal to its local historical percentage

6

multiplied by the "monthly hold harmless amount." 2005 KY H.B. 272 § 113(2)(d)(codified at KRS § 136.650(2)(d)). The "monthly hold-harmless amount" is $3,034,000 which represents 1/12 of the total potential collections into the fund. 2005 KY H.B. 272 § 113(2)(c)(codified at  KRS § 136.650(2)(c)).

In return for their participation in this fund, the local governments agree to relinquish any right to a franchise fee or tax on multichannel video programming services. 2005 KY H.B. 272 § 113(1)(b)(codified at KRS § 136.650(1)(b)).

**5)    Section 118 – Local Franchise Fees Prohibited and Potential Tax Credit.**

Pursuant to Section 118 of the 2005 Amendments, local governments are prohibited from levying any franchise fee or tax on a multichannel video programming service or from collecting any franchise fee or tax from providers or purchasers of multichannel video programming services. 2005 KY H.B. 272 § 118(1)(codified at KRS § 136.660). A "franchise fee or tax" is defined as:

> (a) any tax, charge, or fee, that is required by ordinance or agreement to be paid to a political subdivision by or through a provider, in its capacity as a provider, regardless of whether the tax, charge, or fee, is: 1) designated as a franchise fee, sales tax, excise tax, user fee, occupancy fee, subscriber charge, license fee, or otherwise; 2) measured by the amounts charged for services, the type or amount of equipment or facilities deployed, or otherwise; 3) intended as compensation for the use of public or private rights-of-way, the right to conduct business, or otherwise; or 4) permitted or required to be separately stated on the purchaser's bill; or
> (b) Any in-kind payment of property or services that is required to be furnished by a provider by any ordinance that is enacted or agreement that is entered into after January 1, 2006.

2005 KY H.B. 272 § 118(2)(as codified at KRS § 136.660(2)).

If a local government imposes or attempts to impose a franchise fee or tax, the local government may not receive any share of the proceeds of the taxes levied by Sections 90 or 96 for the period that the imposition or attempt occurs. 2005 KY H.B. 272 § 118(4)(codified at KRS §

7

136.660(4)).   Further, if a provider of a multichannel video programming service actually pays a franchise fee or tax with respect to the service, the provider is entitled to a credit in the amount of the franchise fee or tax against the amount due under Sections 90 or 96. 2005 KY H.B. 272 § 118(5)(codified at KRS § 136.660(5)).

     **E.     The Satellite Company's Complaint.**

     With their Complaint, the Satellite Companies argue that the provisions of Section 118 of the 2005 Amendments that "afford cable system operators credits against the state excise and gross revenues taxes and relief from franchise fees unconstitutionally discriminate against interstate commerce in violation of the Commerce Clause."  (Rec. No. 1, Complaint, ¶ 32). The Satellite Companies ask the Court to declare unconstitutional only subsections 1, 4 and 5 of Section 118. (Rec. No. 1, Complaint, Prayer for Relief ¶ 1).

     The Satellite Companies argue that, with the new provisions, the Cable Companies receive a tax preference because "revenues from the state excise and gross revenues tax [fund are used] to pay the franchise fee cable operators would otherwise have to pay local governments for access to local rights-of-way."  (Rec. No. 13, Response at 3).  The Satellite Companies argue that the tax provisions discriminate against interstate commerce because:

> [T]he availability of the tax preference depends on the geographic location of the facilities used to distribute television service. Cable companies, who provide service by local cable networks and pay franchise fees to local governments for that privilege, receive the preference. Satellite television companies, who provide services by satellites which are necessarily located out-of-state and pay the federal government for that privilege, do not receive the preference.

(Rec. No. 13, Response at 2).

     So, by paying the new taxes, cable systems defray one of their significant costs of doing business.  By contrast, no benefit is available to satellite providers, because of

8

the out-of-state character of their facilities.  While the costs of building satellite systems and securing spectrum and orbital locations are substantial, these resources are not within the power of any municipality to give.  Thus, the satellite providers receive no comparable benefits to those received by cable systems, despite making the same payments.

(Rec. No. 1, Complaint ¶ 5).

In other words, the Satellite Companies argue that, in return for paying the new taxes, Cable Companies receive a corresponding relief from a portion of their operating costs, i.e., the price paid for the right to provide cable service in the franchise area and for rights of access to public rights-of-way.  The Satellite Companies, on the other hand, pay the new taxes but receive no relief from their operating costs. This constitutes discrimination against interstate commerce according to the Satellite Companies because the burdened entities – the Satellite Companies – employ out-of-state facilities to distribute television service, while the benefitted entities – the Cable Companies – employ in-state facilities to distribute television service.

Thus, it appears that the Satellite Company's complaint is not just with the prohibition against local franchise fees found in Section 118 of the 2005 Amendments but is instead also with the new state taxes imposed under Sections 90 and 96 and the tax distribution system imposed under Section 113 by which a portion of the new taxes are distributed to local governments in an amount proportionate to the amount the local governments previously collected in franchise fees.  The Court will consider all of these provisions in determining whether Kentucky's new tax provisions violate the dormant Commerce Clause.

## II.   ANALYSIS.

On a motion to dismiss made pursuant to Fed. R. Civ. P. 12(b)(6), "the factual allegations in the complaint must be regarded as true.  The claim should not be dismissed unless it appears

beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheid v. Fanny Farms Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (quoting *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983)).

### A.     The Dormant Commerce Clause.

The Commerce Clause of the United States Constitution authorizes Congress to "regulate Commerce. . . among the several States. . . ."  U.S. Const. art. I, § 8 cl. 3.  "[T]he very purpose of the Commerce Clause was to create an area of free trade among the several States." *Westinghouse Electric Corporation v. Tully*, 466 U.S. 388, 402 (1984)(citation omitted).  Thus, "[a]lthough the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *South-Central Timber Dev. Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984).

Favoring in-state economic interests over out-of-state economic interests is a classic means by which a state may discriminate against interstate commerce.  In fact, the Supreme Court has repeatedly stated that "discrimination," for purposes of the Commerce Clause, "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of Ore.*, 511 U.S. 93, 99 (1994.  Pursuant to these cases, states may not provide " a direct commercial advantage to local business." *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959).  This is because, "[p]ermitting the individual States to enact laws that favor local enterprises at the expense of out-of-state businesses would invite a multiplication of preferential trade areas destructive of the free trade which the Clause protects." *Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318,

329 (1977).  Such a result would be contrary to the fundamental objective of the dormant Commerce Clause which is to "preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors."  *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997).

A statute can discriminate against out-of-state interests in three different ways:  (1)  it may be facially discriminatory; (2) it may have a discriminatory intent; or (3) it may have a discriminatory effect.  *Amerada Hess Corp. v. Director, Division of Taxation, New Jersey*, 490 U.S. 66, 75 (1989); *Eastern Ky. Resources v. Fiscal Court of Magoffin County*, 127 F.3d 532, 540(6th Cir. 1997)(citing *Wyoming v. Oklahoma*, 502 U.S. 437, 454-55(1992)).

"State laws that discriminate on their face against interstate commerce are presumptively invalid."  *Id.* at 532 (citing *Oregon Waste Sys. Inc.*, 511 U.S. at 99-100. "This is because these laws are almost always reflective of a state's attempt to isolate itself from the national economy and to protect local actors."  *Id.* (citing *Fort Gratiot Sanitary Landfill Inc. v. Michigan Dep't of Natural Resources*, 504 U.S. 353, 361 (1992)).

**B.     Statute does not Facially Discriminate against Interstate Commerce.**

Here, the statute does not discriminate on its face against out-of-state interests. The lnguage of the new tax provisions do not distinguish between in-state and out-of-state economic interests. Instead, each of the relevant provisions evenhandedly applies to any multichannel video programming service provider.  Accordingly, "there is no explicit discriminatory design to the tax." *Amerada*, 490 U.S. at 76.

11

**C.      The Satellite Companies Cannot Show that the Statute has a Discriminatory Purpose.**

"It is axiomatic that a state law that purposefully discriminates against out-of-state interests is unconstitutional." *Eastern Ky. Resources*, 127 F.3d at 541. "The party challenging the validity of the regulation has the burden of demonstrating that the regulation has a discriminatory purpose." *Id*. "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes.  Often these words are sufficient in and of themselves to determine the purpose of the legislation.  In such cases, we have followed their plain meaning." *Id.* (quoting *Perry v. Commerce Loan Co.*, 383 U.S. 392, 400 (1966)).

The only evidence in the record regarding the Kentucky legislature's intent with regard to the relevant provisions of the 2005 Amendments is found in the statute itself, which states that the new tax and distribution system:

1)      Addresses an important state interest in providing a fair, efficient and uniform method for taxing communications services sold in this Commonwealth;

2)      Overcomes limitations placed upon the taxation of communications service by federal legislation that has resulted in inequities and unfairness among providers and consumers of similar services in the Commonwealth;

3)      Simplifies an existing system that includes a myriad of levies, fees and rates imposed at all levels of government, making it easier for communications providers to understand and comply with the provisions of the law;

4)      Provides enough flexibility to address future changes brought about by industry deregulation, convergence of service offerings, and continued technological advances in communications; and

5)      Enhances administrative efficiency for communications service providers, the state, and local governments by drastically reducing the

number of returns that must be filed and processed on an annual
basis.

2005 KY H.B. 272 § 88(codified at KRS § 136.600). This language does not indicate any intent to

protect local economic actors or to economically isolate the Commonwealth from the rest of the

nation. *Eastern Ky. Resources*, 127 F.3d at 542. The Satellite Companies have presented no

evidence that the new tax and distribution system was "motivated by an intent to confer a benefit

upon local industry not granted to out-of-state industry." *Amerada*, 490 U.S. at 76.

Furthermore, even if the Satellite Companies could produce evidence that the legislature

intended to burden them and to benefit the Cable Companies, this would not establish an intent to

discriminate against interstate commerce. For reasons that will be explained further below,

discrimination against satellite-delivered programming in favor of cable-delivered programming does

not constitute discrimination against interstate commerce.

### D.       Statute Does not Have a Discriminatory Effect.

As to whether the new tax provisions have a discriminatory effect, for purposes of this

motion, the court will presume that the new taxes and the distribution system imposed by the 2005

Amendments have the effect of burdening the Satellite Companies and benefitting  the Cable

Companies.  Such an effect is, of course, irrelevant under the dormant Commerce Clause unless it

constitutes discrimination against interstate commerce. The Satellite Companies argue that,

discrimination against them in favor of the Cable Companies has the effect of discriminating against

interstate commerce because the Satellite Companies are "out-of-state" economic interests while the

Cable Companies are "in-state" economic interests.

The plaintiffs bear the initial burden of showing that a statute has a discriminatory effect on

13

interstate commerce. *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979). If the plaintiffs meet that burden, the Commissioner bears the burden of establishing that the challenged government action "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Oregon Waste Sys., Inc., ,* 511 U.S. at 101.

The Satellite Companies argue that this case is similar to *West Lynne Creamery, Inc. v. Healy*, 512 U.S. 186 (1994) and *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977). In *West Lynn Creamery,* the Supreme Court reviewed a Massachusetts statute that imposed a tax on all milk sold by dealers to Massachusetts retailers. 512 U.S.at 188. The tax collected was then distributed as a subsidy to Massachusetts dairy farmers. *Id*. The Supreme Court found that the statute's "avowed purpose and its undisputed effect are to enable higher cost Massachusetts dairy farmers to compete with lower cost dairy farmers in other States. . . Although the tax also applies to milk produced in Massachusetts, its effect on Massachusetts producers is entirely (indeed more than) offset by the subsidy provided exclusively to Massachusetts dairy farmers." *Id*. at 194. Thus, the Court found, "[l]ike an ordinary tariff, the tax is. . . effectively imposed only on out-of-state products." *Id*. Accordingly, the Court found the statute unconstitutional because, "the purpose and effect of the pricing order are to divert market share to Massachusetts dairy farmers. This diversion necessarily injures the dairy farmers in neighboring States." *Id*. at 203.

In *Hunt*, the Court reviewed a North Carolina statute that prohibited closed containers of apples shipped into the State from bearing any grade other than the U.S. grade. 432 U.S. at 335. Washington State, the nation's largest apple producer, had developed its own grading system for apples that was equivalent to or superior to the U.S. grading system. *Id*. at 336. The Washington State Apple Advertising Commission argued that the North Carolina statute prohibiting the display

14

of Washington State apple grades discriminated against interstate commerce. *Id.* at 335.

The Supreme Court determined that the challenged statute had the practical effect of not only burdening interstate sales of Washington apples but also discriminating against them. *Id*. at 350. First, it found that the statute forced Washington apple growers to alter their marketing practices in order to comply with the statute, unlike their North Carolina competitors. *Id*. at 351. "[T]he increased [costs of doing business] imposed by the statute would tend to shield the local apple industry from the competition of Washington apple growers and dealers. . . ." *Id.* The Court also found the statute "has the effect of stripping away from the Washington apple industry the competitive and economic advantages it has earned for itself through its expensive inspection and grading system." *Id*.

Finally, the Court found the statute would deprive Washington sellers of the market premium that apples sold under the superior Washington grades would otherwise command. *Id*. at 352. "Such 'downgrading' offers the North Carolina apple industry the very sort of protection against competing out-of-state products that the Commerce Clause was designed to prohibit." *Id*.

### 1)    Statute does not Discriminate on the Basis of Geographic Location.

The entire premise of the Satellite Company's Complaint is that Kentucky's new tax provision benefits an alleged local interest, the Cable Companies, and burdens an alleged out-of-state interest, the Satellite Company. However, there is no evidence in the record regarding the principal places of business, states of incorporation or the states in which the Satellite Companies and the Cable Companies engage in economic activities. Nor have the Satellite Companies presented any other evidence from which the court can conclude that the Cable Companies are in-state economic interests.

15

The Satellite Companies assert that they are headquartered in states other than Kentucky and that they have no offices in Kentucky.  The KCTA asserts that at least the four largest Cable Companies operating in Kentucky also are headquartered in states other than Kentucky.  The parties assert that both the Cable Companies and the Satellite Companies have some employees in the state. Clearly, both engage in the economic activity of selling video programming in the state.

Based on these undisputed assertions, the Cable Companies no more a "resident," "local," or "in-state" business than the Satellite Companies.   Thus, regarding a statute that has different effects on the Satellite Companies and the Cable Companies, "there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply."  *General Motors v. Tracy*, 519 U.S. 278, 300 (1997).

More importantly, however, regardless of their geographic location, it is clear that the alleged statutory burden imposed on the Satellite Companies has nothing to do with their residence or the location of their economic activities.  While conceding that Kentucky's new tax provisions require both the Cable Companies and the Satellite Companies to pay new Kentucky taxes, the Satellite companies complain that the Cable Companies will be relieved of local franchise fees while the Satellite Companies will still be burdened with federal satellite transmission fees.

Even if a satellite company should move it headquarters to Kentucky, incorporate in Kentucky and deliver programming only in Kentucky, it  would still suffer the burden of having to pay the federal government for the right to transmit via satellite. Furthermore, a cable company headquartered and incorporated outside of Kentucky would still not be required to pay the federal government for the right to transmit via satellite. The different effects of Kentucky's new tax provisions on Satellite Companies and Cable Companies are owed not to the geographic location of

16

the companies, but to their different delivery mechanisms. The Satellite Companies' alleged burden of having to pay the federal government for the right to transmit via satellite and having to compete with Cable Companies who do not have such an expense and who no longer have to pay local franchise fees falls equally on in-state and out-of-state Satellite Companies.

Thus, the statute has the same effects on the Satellite Companies and the Cable Companies whether or not a particular company is a domiciliary or resident of Kentucky. Because the statute "visits its effects equally upon both interstate and local business," *CTS Corp. v. Dynamics Corp.*, 481 U.S. 69, 87 (1987)(quotations and citation omitted), it cannot be said to discriminate against interstate commerce on the basis that it benefits in-state economic interests and burdens out-of-state economic interests.

The Satellite Companies' Complaint is not aimed solely at the effects of Kentucky's new tax provisions. It is aimed at the combined effects of the state statute and federal laws that impose satellite transmission fees. As no party has raised the issue, the court will not address whether a state statute may be challenged under the dormant Commerce Clause on the basis that, when its effects are combined with those of federal law, an unconstitutional burden is imposed on interstate commerce. It is clear, however, that the Satellite Companies' real complaint is with federal fees that apply to them solely because they deliver programming by satellite, not because of their geographic location or that of their competitors.

**2)      The Dormant Commerce Clause Protects the Interstate Market, not Particular Delivery Mechanisms.**

The Supreme Court has stated that the dormant Commerce Clause protects the interstate market for a particular product, but it does not protect "the particular structure or methods of

17

operation in a retail market." *Exxon Corporation v. Governor of Maryland*, 437 U.S. 117, 127 (1978). Nor does it protect "particular interstate firms" operating in an interstate market. *Id.* Likewise, the Supreme court has held that "the Commerce Clause is not violated when the differential tax treatment of two categories of companies 'results solely from differences between the nature of their businesses, not from the location of their activities.'" *Kraft General Foods, Inc. v. Iowa Dept. of Revenue and Finance*, 505 U.S. 71, 78 (1992)(quoting *Amerada Hess Corp. v. Director, Div. of Taxation, N.J. Dept. of Treasury*, 490 U.S. 66, 78 (1989)).

In *Amerada*, the Supreme Court reviewed a New Jersey statute that denied oil producers a state tax deduction for the federal "windfall profit tax" imposed on producers of crude oil. *Id.* at 68. The plaintiff oil companies argued that the deduction denial discriminated against oil producers who market their oil in favor of independent retailers who do not produce oil. *Id.* at 78. They argued that the state had singled out a business activity – oil production – conducted only in other jurisdictions for a special tax burden. *Id.* at 77. The Supreme Court noted that the state also denied tax deductions for the federal income tax which applied to corporations across the country. *Id.* at 77. Thus, the Court determined that the deduction denial did not discriminate on the basis of geographic location and "whatever disadvantage this deduction denial might impose on integrated oil companies does not constitute discrimination against interstate commerce." *Id.* at 77-78.

The Court explained that the oil producing plaintiffs "operate both in New Jersey and outside New Jersey. Similarly nonproducing retailers may operate both in New Jersey and outside the State. Whatever different effect the [deduction denial] may have on these two categories of companies results solely from differences between the nature of their businesses, not from the location of their activities." *Id.* Thus, the Court determined that the statute did not discriminate against interstate

18

commerce. *Id.* at 79.

Here too, as explained above, the statute's different effects on the Satellite Companies and Cable Companies has nothing to do with the geographic location of their economic activities. No matter where a satellite company operates, it is going to have to pay the federal government for the right to transmit via satellite. The statute's different effect on the Cable Companies and the Satellite Companies is not due to their geographic location. The different effect is due to the manner by which they deliver programming.

In *Exxon*, the Supreme Court reviewed a Maryland statute that prohibited oil producers or refiners from operating a retail service station within the state. 437 U.S. at 119. The statute was in response to complaints about inequitable distribution of gasoline among retailers in the state during the oil shortage of the 1970s. *Id.* at 121. The state government had determined that gasoline stations operated by producers and refiners had received preferential treatment during the shortage. The statute thus required the major oil companies such as Exxon to divest themselves of their retail service stations in the state. *Id.*

There were no local oil producers or refiners so Exxon could not claim that the statute discriminated in favor of them. *Id.* at 125. Thus, Exxon focused on the retail market and argued that the statute protected in-state independent dealers in the gas retail market from out-of-state competition. *Id.* The Court noted that there were several major interstate marketers of petroleum that owned retail gas stations in Maryland but did not produce or refine gasoline. *Id.* at 125-26. These interstate marketers, like the oil refiners, competed directly with the in-state independent dealers but they were not affected by the statute. *Id.* at 126.

The Court held that, as to these marketers, the Maryland statute created no barriers. "[I]t does

19

not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market. The absence of any of these factors fully distinguishes this case from those in which a State has been found to have discriminated against interstate commerce." *Id.* at 126. "The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Id*.

The Court recognized that, as a result of the statute, refiners may stop selling gasoline in Maryland and that consumers may start purchasing gasoline from independent dealers instead of company-operated gas stations. *Id*. at 127. Nevertheless, the Court stated, "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another." *Id*. at 127. The Court also recognized that consumers could be injured by the loss of high-volume, low-priced stations operated by the refiners. Nevertheless, the Court found that these results "relate[] to the wisdom of the statute, not its burden on commerce." *Id.* at 128. The Court rejected Exxon's "underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market," stating that the dormant Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Id*. at 127-28.

In *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200 (2nd Cir. 2003), the Second Circuit reviewed a New York statute that prohibited cigarette sellers from shipping cigarettes directly to New York consumers. *Id*. at 204. The district court had determined that the statute violated the dormant Commerce Clause because the only way an out-of-state seller could sell cigarettes to New York consumers was by establishing a store physically located in New York and this would be cost

prohibitive for them. *Id*. at 212.  Accordingly, the district court concluded that the statute effectively eliminated out-of-state direct sales retailers from the New York market by requiring face-to-face, in-state retail sales only.  *Id*.

The Second Circuit, however, found that, even if the only way that an out-of-state direct shipper could sell retail cigarettes to New Yorkers was to establish a brick-and-mortar outlet in New York, in-state direct shippers suffered the same burden as out-of-state direct shippers and, thus, the statute did not discriminate against out-of-state direct shippers.  *Id*.  Citing to *Exxon*, the court also determined that the fact that the particular plaintiff direct shippers may be priced out of the New York retail cigarette market did not establish a discriminatory effect because the fact that consumers may shift from one supplier to another does not subject interstate commerce to an impermissible burden. *Id*. at 213 (citing *Exxon*, 437 U.S. at 127-28).  Citing to Exxon's holding that the Commerce Clause does not protect the particular structure or methods of operation in a retail market, the Second Circuit also determined that the New York statute, "merely prohibits one manner in which cigarettes could otherwise be sold to New York consumers, namely through direct shipments."  *Id*. (citing *Exxon*, 437 U.S. at 127).

Thus, in *Amerada* and *Exxon*, the Court determined that the dormant Commerce Clause prohibits discrimination against the interstate market for retail gasoline but not specifically against retailers in that market who are oil producers.  In *Brown & Williamson*, the Second Circuit relied on *Exxon* in finding that the dormant Commerce Clause prohibits discrimination against the interstate market for retail cigarettes, but not discrimination against retailers in that market who sell cigarettes in a particular manner.

In this case, the relevant market is the interstate market for multichannel video programming

21

and the relevant retailers are multichannel video programming service providers including those firms that deliver programming by satellite and those firms that deliver programming by cable. *See, e.g.,* Rec. No. 1, Complaint, ¶ 22 ("The relevant product market in which satellite and cable television companies compete is the market for multi-channel video programming distribution."). In accordance with *Exxon*, the dormant Commerce Clause prohibits discrimination against the interstate market for multichannel video programming, but it does not necessarily prohibit discrimination against programmers in that market who deliver programming by satellite as opposed to cable.

The Satellite Companies argue that this case is different from *Exxon* and *Amerada* because the "'nature' of satellite and cable distribution is inextricably linked to geography." (Rec. No. 13, Response at 2, 3, 21). Thus, the Satellite Companies appear to argue, while in *Exxon* and *Amerada*, the Supreme Court held that discrimination based upon an out-of-state actors' method of operation or the nature of its business – as opposed to its geographic location – is not prohibited under the Commerce Clause, here such discrimination would be unconstitutional. This is because a satellite company necessarily delivers programming from satellites orbiting the earth and could never deliver programming from satellites located in the state. Cable Companies, on the other hand, necessarily deliver programming by means of cables located in the state. Thus, the Satellite Companies argue, in the interstate market for multichannel video programming, discrimination against the economic actors that deliver programming by satellite necessarily constitutes discrimination based on the programming providers' geographic location.

In reality, however, the mechanisms by which both the Cable Companies and the Satellite Companies deliver programming lie partially outside of Kentucky and partially inside the state. In

22

arguing that their transmission mechanisms lie totally outside of Kentucky, the Satellite Companies have arbitrarily considered only the location of their orbiting satellites. Even without considering whether the Satellite Companies utilize "local receive facilities" that are located in the state as the KCTA alleges, the Satellite Companies must concede that, in transmitting programming, they rely upon a multitude of receive dishes throughout the state.

It is also false that Cable Companies utilize only transmission facilities located in the state. Again, in determining the location of the Cable Companies' delivery mechanisms, the Satellite Companies have arbitrarily looked only to the cable headend and the cables laid or strung in the state. Before the cable programming ever gets from the cable headend to the subscribers, however, it is transmitted to the headend by out-of-state satellites and microwave systems.

More importantly, however, even assuming that the Satellite Companies' entire transmission system lies outside Kentucky and the Cable Companies' entire transmission system lies inside state, the Court finds no support for the proposition that the dormant Commerce Clause prohibits discrimination against particular means of delivering a product when those means are "inherently" out-of-state. In *Amerada*, the issue was whether the New Jersey tax deduction denial discriminated against oil producers who are gasoline retailers in favor of local gasoline retailers who are not oil producers. 490 U.S. at 78. The Court specifically noted that the oil producers could not move their oil-producing activities to New Jersey because no oil reserves exist there. *Id*..

Thus, the oil-producing gas retailers in *Amerada* were as inherently "out-of-state" as satellite-delivering multichannel video programming providers. The Court considered this information as relevant only because it tended to show that the statute could not have been intended to induce the oil producers to move their oil-producing activities to New Jersey. Given this, the Court concluded,

23

"it is difficult to see how [the statute] unconstitutionally discriminates against interstate commerce." *Id.* at 78; *see also Id.* at 78 n.10 ("in the absence of discriminatory intent or a statute directed specifically at economic activity that occurs only in a particular location. . ., a deduction denial does not unduly burden interstate commerce just because the deduction denial relates to an economic activity performed outside the taxing State." )

*Exxon* and *Amerada* make clear that the dormant Commerce Clause does not protect particular firms, particular methods of operation, or particular means of delivering a product. It protects interstate markets. Thus, whether the Satellite Companies' means of delivery are inherently out-of-state or not, in order to establish a violation of the dormant Commerce Clause, the Satellite Companies must prove that the new Kentucky tax provisions discriminate against the interstate market for multichannel video programming. The Satellite Companies argue that they meet this burden simply by showing that some out-of-state actors – those delivering programming by satellite – are burdened by Kentucky's new tax provisions.  *Exxon* and *Amerada* make clear that this is wrong.

### 3)     The Statute does not Encourage Economic Activity in Kentucky or Discourage the same activity in other States.

The Satellite Companies argue that this case is similar to those in which the Supreme Court has held that a state violates the dormant Commerce Clause when it imposes "greater burdens on economic activities taking place outside the State than [are] placed on similar activities within the State." *Westinghouse Electric Corporation v. Tully*, 466 U.S. 388, 403-04 (1984).

Thus, for example, in *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318  (1977), the Supreme Court reviewed an amendment to New York's stock transfer tax that provided a reduction

24

in the tax on nonresidents if the transaction involved a sale in New York.  *Id*. at 324.  The Court explained that, prior to the amendment, the New York transfer tax was neutral as to in-state and out-of-state sales.  An in-state transfer or delivery of securities triggered the tax and the burden fell equally on all transactions regardless of where the sale occurred.  *Id.* at 330.  Thus, "the choice of an exchange for the sale of securities that would be transferred or delivered in New York was not influenced by the transfer tax; wherever the sale was made, tax liability would arise. The flow of interstate commerce in securities was channeled neither into nor out of New York by the state tax." *Id*.

As a result of the amendments, however, if a delivery or transfer of stock occurred in New York, the seller could "substantially reduce his tax liability by selling in State."  *Id.* at 331.  The Court determined that "[t]he obvious effect of the tax is to extend a financial advantage to sales on the New York exchanges at the expense of the regional exchanges" in other states creating "both an advantage for the exchanges in New York and a discriminatory burden on commerce to its sister states."  *Id*.  The Court found that New York's use of its "power to tax an in-state operation as a means of 'requiring (other) business operations to be performed in the home state,'" was "wholly inconsistent with the free trade purpose of the Commerce Clause."  *Id*. at 336.

In *Maryland v. Louisiana*, 451 U.S. 725 (1981), the Supreme Court reviewed a Louisiana statute that imposed a use tax on natural gas imported into in the state that had not already been taxed by another state or the federal government.  *Id*. at 731.  The tax owed was precisely equal to the state's severance tax imposed on Louisiana gas producers.  *Id*.  Since most states would have already taxed gas produced in their own state through severance taxes, the primary entities paying the Louisiana use tax would be those entities using gas produced from the federal outer continental shelf

25

("OCS") beneath the Gulf of Mexico and piped to processing plants in Louisiana.  *Id*. at 731.

An owner paying the use tax on  OCS gas received a credit on any state severance tax owed for gas produced in Louisiana.  *Id*.  at 756.  The purpose of the tax was to equalize competition between gas produced in Louisiana and subject to the state severance tax and gas produced elsewhere that was not subject to the severance tax such as OCS gas.  *Id*. at 732.  The Court found that, "[o]n its face, this [severance] tax credit favors those who both own OCS gas and engage in Louisiana production."  *Id*. at 756-57.  The effect was to "encourage natural gas owners involved in the production of OCS gas to invest in mineral exploration and development within Louisiana rather than to invest in further OCS development or in production in other states."  *Id*. at 756-77.

In *Westinghouse*, the Supreme Court reviewed a New York statute that provided an income tax credit for receipts based upon a company's export products shipped from New York.  466 U.S. at 393.  The Court determined that the statute had the effect of allowing a greater tax credit as a company moves more of its shipping activities into New York and decreasing the tax credit as a company increases its shipping activities in other states.  *Id*. at 400. Thus, the statute both "provide[d] a positive incentive for increased business activity in New York State" and "penalize[d] increases in the [company's] shipping activities in other states."  *Id*. at 400-01.

The Court determined that the statute created "an advantage for firms operating in New York by placing a discriminatory burden on commerce to its sister States.'"  *Id*. at 406.  (quotations and citation omitted).  The Court determined that the New York statute "violated the prohibition in *Boston Stock Exchange* against using discriminatory state taxes to burden commerce in other States in an attempt to induce business operations to be performed in the home State that could be more efficiently performed elsewhere."  *Id*. (quotations and citation omitted).

In each of these cases, the Court determined that the statute's effect was to encourage economic activity in the legislating state and to discourage that same activity in other states. There is not even an allegation here that Kentucky's new tax provisions would have the effect of encouraging any economic activity in Kentucky or discouraging that same activity elsewhere. The Satellite Companies argue only that the statute will encourage Kentuckians to switch to cable programming because it will be comparatively cheaper than satellite programming.

For the reasons discuss above, however, this does not establish an unconstitutional burden on interstate commerce. Again, there is no basis from which this Court can determine that cable-delivered programming is an industry any more local to Kentucky than satellite-delivered programming. Furthermore, the statute would inflict the same burden on an  in-state satellite company as on an out-of-state satellite company and the same benefit on an out-of-state cable company as an in-state cable company.  Finally, the fact that a statute would burden certain out-of-state firms does not establish a violation of the dormant Commerce Clause.

Thus, this is not a case where a state is encouraging the development of a local industry by imposing greater burdens on economic activity taking place outside the state.  In fact, the Satellite Companies have put forth no explanation as to how the state of Kentucky benefits by a statute favoring cable delivery over satellite delivery.

**E.      Pike Balancing.**

Even though the statute does not directly burden interstate commerce, the Court must nevertheless proceed to a second tier of this analysis and determine whether the statute's potential benefits outweigh the burdens that the statute places on interstate commerce. *Eastern Kentucky Resources*, 127 F.3d at 544.

27

"Where [a] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). "The party challenging the statue bears the burden of proving that the burdens placed on interstate commerce outweigh the benefits that accrue to intrastate commerce." *Eastern Kentucky Resources*, 127 F.3d at 545.

The Kentucky legislature has stated that the purpose of the statute is to provide a more fair, efficient, uniform and simple method for taxing communications services in the state.   Again, the Satellite Companies argue they will be burdened by a cost disadvantage relative to the Cable Companies and that Kentuckians may switch from satellite-delivered programming to cable-delivered programming.  Because the Satellite Companies have not offered any evidence that the statute will have any effect on interstate commerce, the Court cannot find that the statute imposes a burden on such commerce that is clearly excessive to the putative local benefits.

## III.   CONCLUSION.

For all the above reasons, the Court hereby ORDERS that the Commissioner's Motion to Dismiss (Rec. No. 10) is GRANTED and this matter is STRICKEN from the active docket of this Court.

This 30th day of March, 2006.



**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**